**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAROLYN JANE PERRY, On Behalf of Herself and All Others Similarly Situated, | **CIVIL ACTION NO.:05-CV- 8696** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYER RETIREMENT INCOME SECURITY ACT** |
| ANDREA JUNG, SUSAN J. KROPF, ROBERT J. CORTI, JANICE MAROLDA KLETTNER, AVON PRODUCTS, INC., THE RETIREMENT BOARD OF AVON PRODUCTS, INC., JP MORGAN CHASE BANK, and JOHN DOES 1-50, | |
| Defendants. | |

Plaintiff Carolyn Jane Perry ("Plaintiff"), on behalf of herself and the Avon Personal Savings Account Plan (the "Plan"), and a class of similarly situated participants and beneficiaries of the Plan (the "Participants"), by her attorneys, alleges the following for her Complaint (the "Complaint"):

**NATURE OF THE ACTION AND SUMMARY OF CLAIMS**

1. Plaintiff, participants in the Plan, brings this action against Avon Products, Inc. ("Avon" or the "Company") and others for Plan-wide relief on behalf of the Plan, and on behalf of a class of Participants in the Plan for whose individual accounts the Plan held an interest in the common stock of Avon between February 20, 2004 to the present (the "Class Period"). Plaintiff brings this action on behalf of the Plan and the Participants pursuant to § 502(a)(2) and (3) of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.    As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are liable to make good to the Plan the losses resulting from each such breach of fiduciary duty.  Plaintiff also seeks equitable relief.

3.    During the Class Period, the Company and its senior executives engaged in a fraudulent scheme intended to artificially inflate the price of Avon common stock.

4.    Plaintiff alleges that it was imprudent for the Plan to invest in Avon common stock because the common stock was too risky for a retirement plan investment in that the price of common stock was artificially inflated.  Plaintiff also alleges that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets and benefits and investing in Avon common stock.

## JURISDICTION AND VENUE

5.    Plaintiff's claims arise under ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.    This Court has jurisdiction over this action pursuant

2

to ERISA Section 502(e)(l), 29 U.S.C. § 1132(e)(l).

7.   Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where some or all of the breaches took place, where one or more Defendants reside or may be found, and/or where the acts and transactions alleged herein, including the administration of the Plan, occurred.

## THE PARTIES

### Plaintiff

8.   Plaintiff Carolyn Jane Perry is a resident of the State of Florida.  At various times, Plaintiff's individual account in the Plan included Avon common stock as an investment option under the Plan.

### Defendants

9.   Defendant Avon is a New York corporation with its principal executive offices located at 1345 Avenue of the Americas, New York, New York.  During the Class Period, Avon had more than 451 million shares of common stock outstanding that were traded on the New York Stock Exchange.

10.  At all relevant times, Avon was the Plan sponsor and administrator and exercised discretionary authority over the Plan, acting through its Board of Directors and officers, including the individual defendants (listed below) and Avon's Retirement Board, to manage and administer the Plan.

3

11.   During the Class Period, Avon had effective control over the activities of its officers and employees, including their Plan-related activities and Avon had the authority and discretion to hire and to terminate its officers and employees who were responsible for administering the Plan.

12.   Avon also had the authority and discretion to appoint, monitor, and remove officers and employees from the Plan's individual fiduciary roles.

13.   At all relevant times Defendant Andrea Jung ("Jung") was Avon's Chief Executive Officer and was a director of the Company.  Defendant Jung is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), in that she exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

14.   During the Class Period, while in possession of material, non-public adverse information about the problems that Avon was having, Defendant Jung sold large amounts of her Avon stock without disclosing the material, adverse information:

(a)   On August 6, 2004, Defendant Jung sold 410,000 shares for proceeds of $17,220,000;

(b)   On August 6, 2004, Defendant Jung exercised options on 195,000 Avon shares at $17.62 per share and immediately sold those shares at $42.0179 per share for proceeds

4

of $8,193,490;

        ©    On August 9, 2004, Defendant Jung exercised options on 125,000 Avon shares at $17.62 per share and immediately sold those shares at between $42.27 and $42.75 per share for proceeds of $5,314,000;

        (d)  On August 10, 2004, Defendant Jung exercised options on 90,000 Avon shares at $17.62 per share and immediately sold those shares at between $43.2548 and $43.36 per share for proceeds of $3,898,000.

15. Defendant Susan J. Kropf ("Kropf") was at all relevant times the Company's President and Chief Operating Officer. Defendant Kropf was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), in that she exercised discretionary authority or control with respect to: (i) managing and administering the Plan; and (ii) managing and disposing of the Plan's assets.

16. While in possession of material, non-public adverse information about Avon, Defendant Kropf sold 220,000 shares of Avon stock on February 9, 2005 for proceeds of approximately $9,968,502 without fist disclosing that information.

17. Defendant Robert J. Corti ("Corti") was at all relevant times Avon's Executive Vice President and Chief Financial Officer. Defendant Corti was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), in that he

5

exercised discretionary authority or control with respect to: (i) managing and administering the Plan; and (ii) managing and disposing of the Plan's assets.  Defendant Corti signed the Plan's Form 11-K filed with the SEC on or about June 29, 2005.

18.  While in possession of material, non-public adverse information about Avon, Defendant Corti sold 204,224 shares of Avon stock for proceeds of $9,073,468 on February 3, 2005 without first disclosing that information.

19.  Defendant Janice Marolda Klettner ("Klettner") was at all relevant times the Company's Vice President and Controller – Principal Accounting Officer.

20.  Upon information and belief, the above individual defendants were senior Avon employees who knew or should have known all material public and non-public information concerning Avon's business and operations that were relevant to the appropriateness of Avon's common stock as a Plan investment.

21.  Defendant Retirement Board of Avon Products, Inc. is comprised of Avon officers, directors and employees who participated in administering the Plan.

22.  Defendant JP Morgan Chase Bank (the "Trustee") is incorporated under the laws of Delaware and maintains its corporate headquarters at 3 Chase Metro Tech Center, 5th Floor, Brooklyn, New York 11245-0000.  At all relevant times, JP Morgan Chase Bank was the Trustee for the Plan and was authorized to

receive contributions and provide custody and investment services for all Plan assets.

23.   Plaintiff is unaware of the true names and capacities of the remaining Defendants sued in this action by the fictitious names JOHN DOES 1 through 50.  Plaintiff will amend this Complaint when Plaintiff learns the names and capacities of those Defendants.  Plaintiff is informed and believes that each of the fictitiously named Defendants is in some manner responsible for the events that have damaged Plaintiff, the Plan and the Class.

## CLASS ACTION ALLEGATIONS

24.   Plaintiff brings this action on her own behalf and, pursuant to Rules 23(a),(b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all current and former participants in the Plan at any time from February 20, 2004 to the present.  Excluded from the Class are Defendants herein, officers and directors of Defendant Avon, members of Defendants' immediate families, and the heirs, successors or assigns of any of the foregoing.

25.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there were hundreds, if not thousands, of present and former employees of Avon who held shares of Avon common stock in their

individual accounts under the Plan.

26.  Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

          (a)  Whether Defendants were fiduciaries;

          (b)  Whether Defendants breached their fiduciary duties;

          ©  Whether the Plan and the Participants were injured by such breaches; and

          (d)  Whether the Class is entitled to damages and injunctive relief.

27.  Plaintiff's claims are typical of the claims of the other members of the Class as Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

28.  Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained able counsel with experience in ERISA class action litigation.  The interests of Plaintiff are coincident with and not antagonistic to the interests of the other Class members.

29.  Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to

individual members of the Class which would establish incompatible standards of conduct for Defendants.  In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

30.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

31.  The Avon Personal Savings Account Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

32.  The Plan is "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount

contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

33.  The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by the Defendants which are then allocated to Participants' individual accounts.

## ADMINISTRATION OF THE PLAN

34.  At all times relevant to this Complaint, all Defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management, disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

35.  Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## FIDUCIARY DUTIES UNDER ERISA

36.  **The Statutory Requirements**: ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

10

> [A] fiduciary shall discharge his duties with
> respect to a plan solely in the interest of
> the participants and beneficiaries and . . .
> for the exclusive purpose of providing
> benefit to participants and their
> beneficiaries; and defraying reasonable
> expenses of administering the plan; with the
> care, skill, prudence, and diligence under
> the circumstances then prevailing that a
> prudent man acting in a like capacity and
> familiar with such matters would use in the
> conduct of an enterprise of like character
> and with like aims; by diversifying the
> investments of the plan so as to minimize the
> risk of large losses, unless under the
> circumstances it is clearly prudent not to do
> so; and in accordance with the documents and
> instruments governing the plan insofar as
> such documents and instruments are consistent
> with the provisions of this title and Title
> IV.

37.  **The Duty of Loyalty:** ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

38.  The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

39.  **The Duty of Prudence:** Section 404(a)(1)(B) also imposes

11

on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

40. **The Duty to Inform:** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

41. Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a Summary Plan Description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the Plan. The SPD and all information contained or incorporated

12

therein constitutes a representation in a fiduciary capacity upon
which Participants were entitled to rely in determining the
identity and responsibilities of fiduciaries under the Plan and
in making decisions concerning their benefits and investment and
management of assets allocated to their accounts:

> The format of the summary plan description
> must not have the effect of misleading,
> misinforming or failing to inform
> participants and beneficiaries. Any
> description of exceptions, limitations,
> reductions, and other restrictions of plan
> benefits shall not be minimized, rendered
> obscure or otherwise made to appear
> unimportant. Such exceptions, limitations,
> reductions, or restrictions of plan benefits
> shall be described or summarized in a manner
> not less prominent than the style, captions,
> printing type, and prominence used to
> describe or summarize plan benefits. The
> advantages and disadvantages of the plan
> shall be presented without either
> exaggerating the benefits or minimizing the
> limitations. The description or summary of
> restrictive plan provisions need not be
> disclosed in the summary plan description in
> close conjunction with the description or
> summary of benefits, provided that adjacent
> to the benefit description the page on which
> the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

42. **The Duty to Investigate and Monitor Investment
Alternatives**:  With respect to a pension plan such as the Plan,
the duties of loyalty and prudence also entail a duty to conduct
an independent investigation into, and continually to monitor,
the merits of the investment alternatives in the Plan, including
employer securities, to ensure that each investment is a suitable

13

option for the Plan.

43. **The Duty to Monitor Appointed Fiduciaries.** Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b) are knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan's participants;

© are provided with adequate financial resources to do their jobs;

(d) have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

(e) have access to outside, impartial advisors when needed;

(f) maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(g) report regularly to the monitoring fiduciaries.

14

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

44. **The Duty Sometimes to Disregard Plan Documents**. A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

45. **Co-Fiduciary Liability**. A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)  if he has knowledge of a breach by such
     other fiduciary, unless he makes
     reasonable efforts under the
     circumstances to remedy the breach.

46. **Non-Fiduciary Liability**.  Under ERISA non-fiduciaries

who knowingly participate in a fiduciary breach may themselves be

liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. §

1132(a)(3).

## PARTICIPANTS ARE NOT RESPONSIBLE FOR IMPRUDENT PLAN INVESTMENTS

47. The fact that Participants selected investments from

options pre-selected by Defendants is no defense in this case.

Fiduciaries can shift liability for imprudent investments to

Participants under ERISA § 404©, 29 U.S.C. § 1104© only if, among

other things, they meet five specific requirements:

(a)  they disclose in advance the intent to shift
     liability to Participants;

(b)  they designate the Plan as "404© Plan" and
     adequately communicate this to Participants;

©   they ensure that Participants are not subject
     to undue influence;

(d)  they provide an adequate description of the
     investment objectives and risk and return
     characteristics of each investment option;
     and

(e)  they disclose to Participants all material
     information necessary for Participants to
     make investment decisions that they are not
     precluded from disclosing under other
     applicable law.  In this regard, fiduciaries
     have a choice B they can disclose all
     material information to Participants,
     including information that they are not

16

> required to disclose under the securities
> laws, and shift liability to Participants, or
> they can comply with the more limited
> disclosure requirement under the securities
> laws but remain liable for imprudent
> investments.

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

48.   Defendants failed to shift liability to Participants for imprudent investment decisions under section 404© because they failed to comply with the relevant regulations.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

49.   For more than one year before commencement of the Class Period, China had been Avon's shining star as illustrated by the following:

(a)   Units grew 28% in the region, reflecting continued rapid expansion of Avon's retail presence in China.  China's sales grew 37% in the quarter and the country was a major contributor to the region's overall profit improvement.  Active Representatives increased 5% in the region. (Avon's Feb 4, 2003 press release);

(b)   "China continued to be the fastest growing market in the Pacific, with sales up approximately 35% in the quarter." (Avon's April 25, 2003 press release);

©   "China generated sales growth of 30%, driven by a 22% increase in units, as business returned to normal levels following the impact of SARS in the second quarter." (Avon's

17

October 28, 2003 press release); and

    (d)  "Excluding the impact of foreign currency exchange, sales rose 9%, with China, Taiwan and Australia driving the gain." (Avon's February 3, 2004 press release)

    50.  On February 20, 2004, the date of commencement of the Class Period, Avon participated in a Consumer Analyst Group of New York Conference.  During this conference, Defendant Corti touted the Company's success in China and touted its prospects for increased growth based upon the resumption of direct selling in China in the future as follows:

> Our fourth and final region, Asia-Pacific, continued rebound in sales and profits.  We had 11 percent increase in dollar sales, a 7 percent increase in local currencies sales and a 17 percent increase in profit.  And that's despite the fact that we were affected, like many consumer goods companies, by SARS early in the year.  Our businesses in China and Taiwan were affected.  But nevertheless, they've rebounded, we have come back and we have turned in very strong performance which we're delighted by.  ***We believe there is great potential for future growth in this region, and I would say that China is our single leading growth sector there.***
>
> I don't know how many of you follow Avon closely.  I'm sure most of you know that direct selling as a model -- not just for Avon -- was prohibited by the government in 1998 due to abuses that some companies had fostered.  We came up with an alternative. We have a very nice business.  It grows between 25 and 30 percent.  It is based in department stores, it's based in hypermarkets.  But the key to the growth there has been the 6,000 independently owned

18

> beauty boutiques that we sell through. We've
> said in the past that the Chinese government
> as part of the accession agreement into the
> WTO has agreed to resume direct selling in
> the future, and just last week it finally
> came out with an announcement that by the end
> of this year regulations will be promulgated
> that will allow direct selling to resume.
> And ***we are ready and we believe it will be a
> wonderful complement to an already successful
> business.  And we're prepared, as I said, and
> ready to go with that as the regulations come
> out.*** I think our model is one --
> particularly the fact that it's a single
> level model, which means in that part of the
> world particularly you sell to a
> representative who sells to a customer and
> earns a commission -- that will probably be
> the model that is most adopted quickly, so I
> think we're in a very, very good position.
> [Emphasis added.]

51. Based upon these comments, the price of the Company's stock rose to a closing price of 35 5/8 from a closing price of 35 5/16 on the previous day.

52. The comments by Defendant Corti were materially false and misleading because Defendant Corti knew and concealed, or recklessly failed to know, that the introduction of direct selling in China would not be "a wonderful complement to an already successful business" in that country; that the introduction of direct selling in China would cannibalize Avon's existing business there, and destroy Avon's relationship with the 6,000 independently owned beauty boutiques that Avon had been selling through . . . the distribution pipeline that was significantly responsible for Avon's phenomenal growth.

19

53.  On April 29, 2004, Avon issued a press release reporting "earnings for the first quarter of 2004 of $.62 per share, up 48% from last year's first-quarter earnings of $.42 per share."  The press release also reported that Avon "also raised its outlook for the full year, with 2004 earnings now projected to be in the range of $3.30 per share, up from its previous guidance of $3.18-$3.20 per share."  Significantly, the press release quoted Defendant Jung as attributing the favorable earnings and increased guidance, in significant part, to Avon's operations in China: "*__Asia Pacific had a strong start to the year with China again contributing substantially to the region's growth . . . ."__*  "*__China, targeted as one of Avon's top growth prospects, continued as the largest contributor to the region's growth.__*"

54.  Upon issuance of the April 29, 2004 press release, the price of the Company's stock climbed to a closing price of 40.00 from a closing price of 39.09 on the previous day.

55.  The comments by Defendant Jung as quoted in the April 29, 2004 press release were materially false and misleading for the reasons set forth in ¶ 52 above.

56.  On April 30, 2004, Avon held its 2001 first quarter conference call.  During this conference call, Defendant Jung announced:

> Another big growth market that we talked

> about, China.  We continue to make additional
> investments in this high priority country to
> prepare for the anticipated lift of a ban on
> direct selling.  You know, we continue to
> work closely with government officials.  Last
> week I was down in Washington, Madam Wuyi was
> here in her meetings with President Bush and
> the trade officials in Washington.  But we
> had a chance to go down there and meet with
> herself and others who are drafting the new
> direct selling regulations.  I continue to be
> extremely optimistic and very pleased with
> the partnership and support from the Chinese
> government in support of our future
> opportunities in that market.  So we continue
> to feel very good there.

57.  The comments by Defendant Jung during the 2001 first

quarter conference call were materially false and misleading for

the reasons set forth in ¶ 52 above.

58.  On June 8, 2004, Avon issued a press release raising

its earnings outlook for the second quarter and full-year 2004 to

reflect a significant reduction in the Company's effective tax

rate.  The press release stated:

> The Asia/Pacific region is forecast to
> generate a high-teens sales gain (up
> low-teens in local currency), with dollar
> operating profit growth expected to exceed
> 25%.  *As anticipated, China continues to be a*
> *standout performer in the region, with sales*
> *projected to grow nearly 50%.*
>
> Commenting on the outlook, Andrea Jung,
> Avon's chairman and chief executive officer,
> said, "The underlying health of Avon's
> business remains extremely strong, and we
> continue to make excellent progress with our
> strategies.  Additionally, we are pleased to
> extend the scope of our Business
> Transformation efforts to include Avon's cash
> management and tax strategies, improving our

> earnings power for shareholders beyond that
> delivered by the continuing strength of our
> global operations," Ms. Jung concluded.
> [Emphasis added.]

59.    The June 8, 2004 press release and the comments by

Defendant Jung which were quoted therein were materially false

and misleading for the reasons set forth in ¶ 52 above.

60.    On July 30, 2004, Avon filed a Form 10-Q with the SEC

for the quarterly period ended June 30, 2004.  This document,

which was signed by Defendant Klettner, stated:

> In China, net sales increased in both periods
> primarily due to growth in units driven by
> consumer motivation programs and increased
> advertising investments.  Additionally, net
> sales growth was driven by an increase in the
> skin care category. . . .  The Company
> anticipates the resumption of direct selling
> activities in some form in China within the
> next year, pending government approval.
> Direct selling had been banned by the Chinese
> government in 1998.  While any implementation
> of this model will likely result in
> transition costs, the Company believes that
> this resumption of direct selling will have a
> positive impact on its results of its
> operations on a long-term basis.

61.    The above statements were materially false and

misleading for the reasons set forth in ¶ 52 above.

62.    On October 29, 2004, Avon filed a Form 10-Q with the

SEC for the quarterly period ended September 30, 2004.  This

document, which was signed by Defendant Klettner, stated:

> In China, net sales increased in both periods
> primarily due to growth in units driven by
> consumer promotion programs and higher
> average orders at the Beauty Boutiques. . . .

22

In China, operating margin improved in the
nine-month period (which increased segment
margin by .6 point) reflecting a higher gross
margin benefiting from sales of products with
higher margins and savings associated with
supply chain Business Transformation
initiatives.  In addition, expenses in the
region for both periods included strategic
investments in organization capacity (which
decreased segment margin by 1.0 and .9
points, respectively). . . .  The Company
anticipates the resumption of direct selling
activities in some form in China within the
next year, pending government approval.
Direct selling had been banned by the Chinese
government in 1998.  While any implementation
of this model will likely result in
transition costs, the Company believes that a
resumption of direct selling will have a
positive impact on its results of its
operations on a long-term basis.

63.  The above statements were materially false and
misleading for the reasons set forth in ¶ 52 above.

64.  On October 29, 2004, Avon held its 2004 third quarter
earnings conference call.  During this call, the following
dialogue took place:

Q25. (Connie Maneaty, Prudential) "Andrea,
did you say regarding China that you thought
you would get written authorization within
minutes?  Are those your words?"

A. (Andrea Jung) "We are working on it now.
We have verbal agreements.  We are working
closely.  I want to step back for a second to
say I feel very strongly that the government
is doing the absolute right thing in terms of
taking the appropriate steps to ensure that
this is regulated properly.  That is the best
thing for China and the best thing for AVP.
In working through the test details, which
will mirror the regs [phonetic] for the full
industry going forward, we just want to make

23

sure that all I's are dotted and T's are
crossed.  I can't tell you today, but I just
meant by that it is imminent and we certainly
hope to talk to you about that in December.
I just want to say the regs really favor
AVP's model.  I think when you look at why
direct selling was banned in 1998, and then
you look at what the government, and I don't
want to speak for them, is considering in the
regulations for 2005 and beyond, it is not an
exodus that we have 6,000 points of sale at
this company structure as it relates to our
point of view on commissions, *et cetera*.  I
think it's extremely well poised to have
major advances as we move into this period.
So, we've done, not just right now, but
everything over the past six years to prepare
ourselves for what we believe will be the
right regulations for this industry going
forward."

65.  The above statements by Defendant Jung were materially
false and misleading for the reasons set forth in ¶ 52 above.

66.  On November 3, 2004, Avon participated in the Morgan
Stanley Global Consumer Conference.  During this conference,
Defendant Jung stated:

I mentioned that China is the number one

growth opportunity for us.  Our actual
current projections, our stated projections,
are in this current model $400 million by the
end of 2007.  As we have said, with the lift
of the direct selling ban (ph), we see the
opportunity longer term to be a billion
dollar market.  This could very well be, and
just take Avon out, the second largest CFT
(ph) market in the world. Then you add on top
of that, I think Avon's penetration in all of
the country, I would say that the average
competitor of ours has a lion's share of
business in the four major markets on the
coast.  So (inaudible), Beijing, Shanghai and
Guangzhou represent over 75 to 80% plus of
most peoples' business, which is where retail
and retail infrastructure resides today.

24

Avon's model today, in the current model, is
exactly the opposite.  Most of our business,
and we have nice healthy businesses in the
large cities, but as you know, we have about
6,000 duty boutiques today.  They are
franchised, they are owned by independents,
but they are in every province in the
country.  From a geographic footprint point
of view, I mean our game is penetration and
coverage, we are everywhere in that country.
We are affordable, we're a well known
globally aspired brand to buy, but we are
everywhere and you don't have to travel to
the big cities or move to the big cities to
buy us.  And when you combine on top of that
the opportunity to have direct selling, which
we believe can live in harmony in hybrid mode
with the already very healthy wholesale or
franchise model, if you would, that we've
established, I think the opportunity is
extraordinary.  So we do see that $400
million opportunity just in the model we're
in, very confident about that. And then you
add on top, too early to exactly quantify it,
but to all of us in the company believe this
will be a billion dollar market.

67.  The above statements by Defendant Jung were materially

false and misleading for the reasons set forth in ¶ 52 above.

68.  On February 1, 2005, Avon held its 2004 fourth quarter

conference call.  During this conference call, Defendant Jung

stated:

The standout performer for the region, for
the quarter, and for the full year was China.
Fourth quarter sales grew 46%, operating
profit increased more than 60% after
significant investments of our market share.

China's full-year 2004 sales increased to
nearly 225 million and its operating margin
improved 300 basis points.  Our proposition
and opportunity in China continue to be
extremely compelling.  Irrespective of the

25

timing of the opening of direct selling, we
expect our 2005 growth in that market to be
in line with that of 2004, which would put
China's revenue well over $300 million this
year.

As you know, the industry is still awaiting
the final government's regulations for the
resumption of direct selling. When issued, we
believe that this new framework will benefit
both the Chinese consumer and the direct
selling industry. ***Very importantly, as I
know, we've talked about before; we feel that
Avon is very well positioned with our current
business model. We believe that our 6,000
beauty boutiques will continue to be a
powerful competitive advantage.*** [Emphasis
added.]

69.   The above statements by Defendant Jung were materially

false and misleading for the reasons set forth in ¶ 52 above.

70.   On February 25, 2005, Avon participated in the Consumer

Analyst Group of New York 2005 Conference.  During this

conference call, Defendant Jung stated:

Just a few comments on a few specific
markets.  But as you know, China, which
delivered about $0.25 billion last year, we
believe will be a $600 million market by the
end of '07, with a local currency growth rate
of about 40 percent.  And that's the growth
rate we had in '04.  That's the growth rate
we project in '05, with or without the
resumption of direct sales.  So I mean I
think you could understand that the
opportunity is pretty huge in this market.
We believe it will be $1 billion business; we
think that it will be the number 2 market to
Avon U.S. sometime in the next decade as this
company -- we think the market share
opportunities, because it's still fragmented.
And this is the early-mover advantage
opportunity -- is great.  Many of you know

26

and have heard me talk about the fact that
most of our competition, 80 percent of their
business is focused in the four major cities
on the coast.  85 percent of Avon's business
is outside the four major markets. It's in 86
provinces.  We are everyplace with our 6,000
Avon Beauty Boutiques at this point.  But
when we are allowed to start recruiting
active representatives, we do believe that we
can have -- well, you know the numbers.  But
if I just took 0.4 per 1,000, and the average
-- I mean just take on the developed market,
it's 2 and change. You know in Latin America
we have almost 7 in some markets --
representatives per thousand population.
It's about 3.5 in Russia, and growing.  But
just the number of representatives alone, if
you take that tiny number in China, is 0.5
million -- because of the population.  And
even if you take out the agricultural
population of women, it's a staggering
opportunity.  You know, we don't want to be
over-bullish about putting a number down
here, so we're going to give a small number
here.  But I just would say, think of that
average. No market has only 0.4. And we think
we have a great opportunity here.  So, just
that number alone, $600 million, is $200
million ahead of what we had said about a
year ago.  And again, we feel very bullish
about China. And I would say -- I contend
that over the next decade this will be Avon's
number one opportunity.

71.  The above statements by Defendant Jung were materially

false and misleading for the reasons set forth in ¶ 52 above.

72.  On March 2, 2005, Avon filed a Form 10-K with the SEC

for the year ended December 31, 2004.  This document, which was

signed by each of the defendants, stated:

"The Company anticipates the resumption of
direct selling activities in some form in
China, pending government approval.  Direct
selling was banned by the Chinese government

27

in 1998.  The Company believes that a
resumption of direct selling will have a
positive impact on its results of operations
on a long-term basis."

73.  The above statement was materially false and misleading
for the reasons set forth in ¶ 52 above.

74.  On April 8, 2005, Avon issued a press release with a
headline which stated: "Avon Starts Direct Selling Test With the
State's Approval."  The press release stated:

> BEIJING, April 8 /PRNewswire-FirstCall/ --
> The Chinese Ministry of Commerce and the
> State Administration for Industry and
> Commerce has officially approved Avon
> Products (China) Co., Ltd. to be the first
> company to test direct selling in Beijing,
> Tianjin, and Guangdong Province in April.
>
> Andrea Jung, CEO of Avon Products Inc. (NYSE:
> AVP), said: "We are so excited that we have
> received the formal approval from the Chinese
> government.  We are extremely honored of this
> opportunity as it equally shows the
> government's confidence and trust on Avon as
> a responsible and reliable direct selling
> company in China.  We will do our part and
> are committed to deliver the objective and
> expectation of the government and look
> forward to direct selling regulation."
>
> SK Kao, President of Avon China rejoined:
> "The objective of the test is to help the
> government find a suitable direct selling
> model that would fit the needs of the Chinese
> consumers, promote social stability and help
> protect consumers against illegal practices
> known as 'Chuan-xiao'.  We will keep doing
> what is right and responsible."
>
> Mr. Kao continued: "The direct selling test
> is a preparation for a successful
> implementation of the direct selling
> legislation. Avon will strictly abide by the

> direct selling law and regulation when they
> are issued."

75.   The April 8, 2005 press release was materially false and misleading for the reasons set forth in ¶ 52 above.

76.   On May 2, 2005, Avon issued a press release which reported earnings for the first quarter of 2005 of $.36 per share, up 16% from the previous year's first-quarter earnings of $.31 per share and $.01 ahead of expectations "due to strong operating profit growth."   The press release stated, in relevant part:

> The Asia Pacific region posted first-quarter
> revenue growth of 10% in dollars and 8% in
> local currency, driven by gains in units and
> active Representatives of 16% and 12%,
> respectively. Operating profit rose 20% and
> operating margin increased to 18.5%, up
> 150-basis points year over year. **China,
> Avon's largest long-term growth opportunity,
> was again the biggest contributor to the
> region's growth, with revenue up nearly 40%.
> In April 2005, Avon China was approved as the
> first company to conduct a direct-selling
> test in that market. . . .  Avon said that
> revenue growth in the second-quarter 2005
> should accelerate ahead of the first quarter,
> with dollar-denominated and local-currency
> growth expected to be in the ranges of 10%
> and 6%, respectively.  Operating profit is
> forecast to increase approximately in line
> with revenue growth, including an
> acceleration of consumer investments in
> emerging markets as well as funding for the
> China direct-selling test.**  [Emphasis added.]

77.   The May 2, 2005 press release was materially false and misleading for the reasons set forth in ¶ 52 above.

78.  On May 2, 2005, Avon held its 2005 first quarter conference call.  During this conference call Defendant Jung stated:

> As I'm sure you've read, the Chinese government in April, officially named Avon the first company to be allowed to test direct selling in China so we're very, very excited about this. The test is getting under way right now.  It allows us to create a prototype for a single level direct selling model in Beijing, Tianjin and in two cities in the Guangdong province.  This is a very excited development, as I said.  A positive indication most of all of the trust and responsibility accorded to us by the Chinese government.  We also believe that the test gives us a first mover advantage at whatever time the final regulations are issued. We're optimistic.  We always have been, about the long term substantial growth we see coming from China in the years ahead and now even more so in light of the recent developments. . . .  The second half of the year should be strong with an exciting beauty innovation pipeline and the U.S. re-accelerating and we're celebrating our wins, particularly like the recent approval from China which bodes well for our incredible long-term opportunity in this market.

79.  Significantly, during the conference call, the following dialogue took place:

> BILL SCHMITZ: One last one going back to China, are you modeling any cannibalization as you experiment with the direct selling model versus what I will call franchisees, the boutique owners?  How do you manage that relationship when you introduce an entirely different kind of way of selling, where these people, obviously already have a ton of skin in the game, have already made the capital investment in their business.

ANDREA JUNG: Let me just kind of give an overview here.  We are obviously extremely excited about the selection being the first company, but let me just remind everybody, this is very small test. So just let's start with that.  It is not going to have any immediate business impact in 2005. You probably read or heard that again it is limited to a couple of cities and it's limited in the number of people we can actually recruit.  So this is more in my mind for really establishing a partnership with the Chinese government, to really model out a single level model, that understands the requirements of the forthcoming regs.

**So the number one, two, and three commitment in 2005 is the continued commitment to our 6,000-plus beauty boutique owners and 1700 beauty counter businesses.**  I mean you saw the revenues which had nothing to do with the direct-selling tests in the first quarter, of 2005, continue to be very strong. And again, nearly 40% so this is the base of our business and will continue to be the base of our business, it has grown, compounded 32% since 2000, and this retail wholesale model which as I think I've spoken to you about, I think the beauty of the China strategy is that there is a hybrid of both, so I mean strategically de facto because of the governments ban on direct selling in 1998 we have an unusual hybrid model opportunity with an infrastructure of counters and beauty boutiques that have had a terrific retail business and presence in that market.

**So while we're conducting this test, we are going to continue to support ever more so the infrastructure in China with heavy investments in advertising and product innovation this year as well as investments in manufacturing, and I.T.  The major thing here is the communication with our beauty boutique owners. As you can imagine since the last couple of weeks and the announcement there has been an extensive communication**

> *process by the sales team across the country*
> *with all beauty boutiques owners so that they*
> *understand our commitment to their success,*
> *but most importantly, understanding the*
> *earnings opportunities for them, in a hybrid*
> *mode, down the road in the future. So we --*
> *again, we've baked all this in and you heard*
> *we are not coming off our long-term target*
> *for this market of 600 million by '07 with*
> *upside opportunity depending on where the*
> *final regs really do come out.* [Emphasis added.]

80.   The above statements by Defendant Jung were materially false and misleading for the reasons set forth in ¶ 52 above.

81.   On July 28, 2005, Avon filed a Form 10-Q with the SEC for the quarterly period ended June 30, 2005.  It revealed the truth as follows:

> *Revenue in the second quarter of 2005 was*
> *impacted by a 19% decline in China, as*
> *compared to a 37% increase in the first*
> *quarter of 2005 and a 43% increase in the*
> *first six months of 2004 as compared to 2003.*
> *In April 2005, the Chinese government*
> *approved Avon to proceed with a limited test*
> *of direct selling in the cities of Beijing*
> *and Tianjin and in the Guangdong Province.*
> *We are waiting for final approval of direct*
> *selling regulations by the Chinese*
> *government. During the second quarter of*
> *2005, the Company's Beauty Boutique owners*
> *significantly reduced the average size of*
> *their orders in what appeared to be an*
> *expression of uncertainty regarding their*
> *future earnings opportunities within the*
> *direct selling model defined by the Chinese*
> *government's new regulations.*
>
> Revenue in both periods benefited from the
> favorable impact of foreign exchange.  The
> growth in active Representatives during the

six-month period was partially  due to an
increase in the number of sales campaigns in
the Philippines beginning in the second
quarter of 2004, which resulted in additional
opportunities to order and increased the
active Representative growth in the region
for the six month period by 4%.

Asia Pacific operating margin declined
primarily due to an unfavorable expense ratio
of 3.8 and 1.2 points, respectively.
Operating margin in the three-month period
was also impacted by a decline in gross
margin of .4 point due primarily to an
unfavorable mix of products sold and
increased product obsolescence.

***In China, operating margin decreased in both
periods (which decreased segment margin by
3.4 and .9 points, respectively). Lower
revenues during the second quarter,
incremental investments associated with the
implementation of direct selling and higher
advertising drove the decline in operating
margin for both periods.*** [Emphasis added.]

### COUNT I

### Breach of Fiduciary Duty of Loyalty to Avoid Conflicts of Interest ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)

82.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

83.  At all relevant times, ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), required Defendants to act solely in the interests of the Plan participants and beneficiaries, including Plaintiff, and for the exclusive purpose of providing benefits to the Plan participants and beneficiaries.

84.   The fiduciary duty of loyalty also entails a duty to
avoid conflicts of interest and to resolve them promptly when
they occur.  A fiduciary must always administer a plan with
single minded devotion to the interests of the Plan and its
participants and beneficiaries, regardless of the interests of
the fiduciaries themselves or the plan sponsor.

85.   Defendants breached their duty of loyalty.

86.   Defendants had significant personal investments in Avon
Stock.

87.   During the Class Period, Defendants Jung, Kropf, and
Corti sold millions of dollars worth of their individual holdings
of Avon Stock.

88.   Thus, Defendants had a significant personal financial
incentive to maintain a high price for Avon Stock.

89.   Defendants, thus, had an incentive not to disclose
negative financial results to the Plan participants in hopes that
such participants would select Avon Stock for their retirement
portfolios and therefore help maintain a high price for Avon
Stock.

90.   Defendants also had an incentive to maintain Avon Stock
as an investment option under the Plan.  If Company Stock were
eliminated as an investment option under the Plan, this would
have sent a negative signal to Wall Street analysts, which in
turn would result in reduced demand for Avon Stock and a drop in

34

the stock price.  Since the compensation of Defendants included
Avon Stock, this sequence of events would reduce their
compensation.

91.  As such, Defendants breached their fiduciary duty of
loyalty because they were faced with a conflict of interest,
which they did not promptly resolve, between their own interest
in maintaining an artificially high price for Avon Stock and the
interests of the Plan participants and beneficiaries to avoid
having their retirement portfolios invested in Avon Stock when it
was imprudent to do so and in receiving accurate information
concerning Avon upon which to base their investment decisions

92.  Defendants also breached their fiduciary duty of
loyalty because they endorsed unreasonable growth estimates for
Avon.  Such endorsement was in the interests of Defendants to
maintain an artificially high price for Avon Stock, but was
detrimental to the interests of the Plan participants and
beneficiaries who were holding and continuing to invest in Avon
Stock based upon misinformation.

93.  Defendants also breached their fiduciary duty of
loyalty because they did not timely disclose negative financial
information described above.  Such non-disclosure aided the
interests of the Defendants in maintaining an artificially high
price for Avon Stock, but ran against the interests of the Plan
participants and beneficiaries who were holding and continuing to

35

invest in Avon Stock based upon misinformation.

94. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

95. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II

### Breach of Fiduciary Duty of Care
### ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B)

96. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

97. At all times relevant hereto, ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), required Defendant to act, with respect to the Plan, with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use in managing an enterprise of like character and with like aims.

98. During the Class Period, Defendants breached their duty of care. They failed to act prudently and failed to use reasonable care, skill, or diligence in offering Avon Stock as an investment option, purchasing Avon Stock for the Plan, monitoring

36

the Plan's investment in Avon Stock, and communicating information concerning Avon's financial performance to Plan participants and beneficiaries.

99.  Avon Stock was an inappropriate Plan investment as:

(a)  it traded at artificially high prices during the Class Period due to misinformation distributed by the Defendants concerning Avon's earnings growth;

(b)  Avon's primary business, was experiencing an industry-wide slowdown that made Avon Stock an imprudent investment as a significant portion of a retirement portfolio;

©  the Company's accounting practices violated GAAP's requirement that financial reporting be useful to present and potential investors and creditors and other investors, and these accounting violations contributed to the artificially high price of Avon Stock during the Class Period; and

(d)  the Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company.

100. At all relevant times, Defendants knew or should have known of the above-mentioned facts, all of which made Avon Stock an imprudent Plan investment.

101. Defendants failed properly to take into account the numerous practices that put Avon Stock at risk as well as the fact that Avon Stock was inflated in value when determining the

prudence of investing and holding Plan assets in Avon Stock.

102. As a result of Defendants' knowledge of and, at times, participation in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification made to Plan participants did not effectively inform Plan participants of the past, immediate, and future dangers of investing in Company Stock.

103. Because Defendants knew or should have known that Company Stock was an imprudent investment for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company Stock.

104. Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary; divesting the Plan of Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

105. Despite the availability of these and other options, Defendants failed to take any action to protect participants from

losses as a result of Plan investment in Avon Stock.

106. As alleged above, the Defendants were all responsible in different ways and to differing extents, for the selection, maintenance, and monitoring of the Plan's investments.

107. Under ERISA, Defendants were responsible for ensuring that all Plan investments in Company Stock were prudent and are liable for losses incurred as a result of such investments being imprudent.

108. Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

109. The Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, these Defendants knew or should have known that Avon Stock was not a suitable and appropriate investment for the Plan.  Nonetheless, during the Class Period, these fiduciaries continued to offer the Avon Stock as an investment for the Plan and to direct and approve Plan investment in Avon Stock.  Moreover, during the

Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Avon Stock.

110. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

111. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Fiduciary Duty to Provide
### Complete and Accurate Information ERISA
### § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)

112. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113. The fiduciary duties of loyalty and prudence also entail a duty to provide complete and accurate information concerning the Plan's investment options, including the financial performance of Avon, to Plan participants and beneficiaries. This duty under ERISA requires fiduciaries to speak truthfully to

40

participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.  This duty applies to all Plan investment options, including investment in Avon Stock.

114. Because investment in the Plan was not diversified (*i.e.,* the Defendants chose to invest the Plan's assets and/or allow those assets to be invested heavily in Avon Stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Avon Stock.

115. The Defendants breached their duty to provide truthful and accurate information to Plan participants and beneficiaries by failing to provide complete and accurate information regarding Avon Stock, Avon's business improprieties, public misrepresentations, inflated earnings and growth estimates, and the consequent artificial inflation of the value of Avon Stock.

41

Defendants also failed to convey accurate information regarding the soundness of Avon Stock and the prudence of investing retirement contributions in Avon equity.  These failures were particularly devastating to the Plan, and thus Plan participants and beneficiaries, because losses in Avon Stock had an enormous impact on the value of participants' retirement assets.

116. Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance and prospects of both the Company and Company Stock.  During the Class Period, the Company fostered a positive attitude toward Company Stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company Stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

117. Defendants failed to provide Plan participants with complete and accurate information regarding Avon Stock, such that the participants could appreciate the true risks presented by investments in Avon Stock and could make informed decisions regarding investments in the Plan.

118. Where a breach of fiduciary duty consists of, or

42

includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above described statements, acts, and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Avon Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Avon Stock during the Class Period.  Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

119. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

120. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Fiduciary Duty to Monitor and Investigate
### ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)

121. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

122. At all relevant times, ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), required Defendants to monitor other fiduciaries.

123. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that meant that the Defendants had the duty to:

(i)  Ensure that the monitored fiduciaries possessed the needed credentials and experience or used qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

(ii) Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(iii) Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(iv) Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan investments;

44

(v)  Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options; and

(vi) Ensure that the monitored fiduciaries reported regularly to the Company.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands on fiduciaries.

124. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

125. The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would

45

have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

126. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

127. Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's true financial performance and growth prospects, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund.  Defendants knew or should have known that as fiduciaries, it was responsible for monitoring and imprudently allowing the Plan to continue offering the Avon Stock as a Plan investment, and continuing to invest in Avon Stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

128. Defendants either failed to conduct an appropriate investigation into whether Avon Stock was a prudent investment for the Plan or disregarded the information learned from such

46

investigation, that Avon Stock was an imprudent investment, in
breach of their fiduciary duties.  In connection with the lack of
or disregard of an appropriate investigation, Defendants failed
to provide the Plan participants with information regarding
Avon's true financial condition so that Plan participants could
make informed decisions regarding Avon Stock in the Plan.
Defendants failed to protect the Plan and its participants
against inevitable losses.

129. The failure of Defendants Jung, Kropf, and Corti in
this regard is particularly acute.  As a result of their
leadership roles within the Company or on the Board, they  knew
or should have known of the Company's true financial condition.
Yet, upon information and belief, despite their obligation to
properly and materially inform participants in the Plan of the
true risks involved with holding Avon Stock, they remained silent
concerning the earnings shortfall and the conditions that
impacted negatively upon Avon's earnings and growth.

130. An adequate investigation by Defendants would have
revealed to a reasonable fiduciary that investment by the Plan in
Avon Stock was imprudent.  A prudent fiduciary acting under
similar circumstances would have acted to protect participants
against unnecessary losses, and would have made different
investment decisions.

131. In addition, as a result of its inappropriate practices

47

and implicit knowledge thereof, Defendants, in connection with
their monitoring and oversight duties, were required to disclose
to the monitored fiduciaries accurate information about the
financial condition and practices of Avon that it knew or should
have known that these Defendants needed to make sufficiently
informed decisions.  By remaining silent and continuing to
conceal such information from the other fiduciaries, Defendants
breached their monitoring duties under the Plan and ERISA.

132. As a direct and proximate result of the breaches of
fiduciary duties alleged herein, the Plan, and indirectly,
Plaintiff and the Plan's other participants and beneficiaries,
lost a significant portion of its retirement investments.

133. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and
ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are
liable to restore the losses to the Plan caused by their breaches
of fiduciary duties alleged in this Count.

### COUNT V

#### Co-Fiduciary Liability
#### ERISA § 405(a), 29 U.S.C. § 1105(a)

134. Plaintiff incorporates the allegations contained in the
previous paragraphs of this Complaint as if fully set forth
herein.

135. ERISA § 405(a), 29 U.S.C. § 1105(a), may impose
liability upon a fiduciary for a breach of fiduciary
responsibility committed by another fiduciary.

48

136. Each Defendant is also liable as co-fiduciaries because they (A) knowingly participated in and knowingly undertook to conceal (i) the failure of the other fiduciaries to provide complete and accurate information regarding Avon Stock, (ii) the conflict of interest facing the other fiduciaries, (iii) the failure to monitor and investigate Plan investments, (iv) the imprudence of the Plan investing in Avon Stock, and (v) the failure to diversify the Plan investments; (B) enabled other fiduciaries to breach their duties as a result of each Defendant's own failure to satisfy his or her fiduciary duties; and © had knowledge of the other fiduciaries' failures to satisfy their fiduciary duties, yet did not make any effort to remedy the breaches.

137. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

138. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

139. The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above.

49

140. As a consequence of the Defendants' breaches, the Plan suffered significant losses.

141. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

142. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

143. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan

resulting from the breaches of fiduciary duties alleged above in an amount based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and (v) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

144. Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for:

A.   A Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as a class representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.   A Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and Participants;

C.   A Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

51

D.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E.   Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.   An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G.   Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

H.   An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Avon common stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of Avon common stock;

I.   Awarding the Plan and/or Participants rescission and/or money damages (including pre-judgment interest) pursuant to the Securities Act;

J.   An Order awarding costs pursuant to 29 U.S.C. §

1132(g);

     K.   An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

     L.   An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: October 12, 2005

**GAINEY & MCKENNA**

_____
Thomas J. McKenna (TJM 7109)
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**VIANALE & VIANALE LLP**
Kenneth Vianale, Esq.
2499 Glades Road, Suite 112
Boca Raton, Florida 33431
Tel: (561) 392-4750
Fax: (561) 392-4775

***Attorneys for Plaintiff***